UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

PENNY ARVIDSON RICHARDS,     )
                                     )
     Plaintiff,          )
                                     )       No. 2:08-CV-279
v.                               )       *Mattice / Lee*
                                     )
JOHNSON & JOHNSON, *et al.*,     )
                                   )
     Defendants.       )

## REPORT AND RECOMMENDATION

Plaintiff Penny Arvidson Richards ("Plaintiff") brought this ERISA[1] action seeking reinstatement of long term disability ("LTD") benefits. Based on the pleadings, the parties were "deemed to have moved for judgment in their respective favor based upon the administrative record," and the motion was referred for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) [Doc. 14].

## I.    INTRODUCTION

Plaintiff alleges that Defendants Johnson & Johnson, Reed Group, LTD ("Reed Group"), Janssen Pharmaceutica, Inc., The Pension Committee of Johnson & Johnson ("Pension Committee"), and the Long Term Disability Income Plan for Choice Eligible Employees of Johnson & Johnson and Affiliated Companies ("Plan") (collectively "Defendant")[2] improperly denied her long term

---

[1] Employee Retirement Income Security Act of 1974 ("ERISA") § 502(a)(1)(B); 29 U.S.C. § 1132 (a)(1)(B).

[2] Defendants are hereafter referred to collectively as "Defendant" except where necessary to differentiate between the various entities. Defendant Reed Group became the third party administrator for the Plan on April 1, 2006 (AR 628). Its predecessor, Broadspire Services, Inc. ("Broadspire"), is not a named party in this action (AR 554). Nonetheless, where appropriate, actions of Broadspire, who was the agent of the Plan, are referred to as the actions of Defendant.

disability ("LTD") benefits under the Plan [Doc. 1, 19]. Defendant (other than Reed Group) asserted a counterclaim seeking recovery of $3,314.78 in alleged overpayments of LTD benefits [Doc. 21 at 27-31]. The parties have fully briefed their motions for judgment on the Administrative Record ("Record" or "AR") [Doc. 30, 34, 35]. The parties also disagree with respect to whether certain portions of the Record should be stricken, and this matter has also been fully briefed [Doc. 29, 32, 33]. Addressed herein are: (1) Plaintiff's objection and motion to strike portions of the Record and Defendant's cross motion to strike other portions of the Record [Doc. 29, 32]; (2) Plaintiff's motion for judgment on the Record [Doc. 30]; and (3) Defendant's motion for judgment on the counterclaim.[3]

After carefully reviewing the Record and the parties' motions and supporting pleadings, I **RECOMMEND** that: (1) the cross motions to strike the Record be **DENIED**; (2) Plaintiff's motion for judgment on the Record be **GRANTED IN PART** and **DENIED IN PART**; (3) Defendant's decision terminating Plaintiff's LTD benefits under the Plan be **REVERSED** and this matter be **REMANDED** to Defendant; and (4) Defendant's motion for judgment on the counterclaim be **DENIED**.

## II. BACKGROUND

Plaintiff, who has a Masters of Business Administration degree from Averatt University, was working as a sales representative for Jansen Pharmaceuticals when in July, 2004, she had "an abrupt

---

[3] Defendant has not filed a motion for judgment on the pleadings concerning the counterclaim for reimbursement of the alleged $3,314.78 overpayment. As the Court's referral and scheduling order provides all parties are deemed to have moved for judgment in their respective favor based upon the Record [Doc. 14], to the extent the alleged $3,314,78 overpayment is addressed in the Record, Defendant is deemed to have moved for judgment on the pleadings on the counterclaim.

syncopal event" and lost consciousness (AR 511-12, 598). She was awarded short term disability ("STD") benefits in August, 2004 (AR 495), but returned to work some time thereafter (AR 535). In November, 2004, Virginia Simnad, M.D., diagnosed Plaintiff with relapsing/remitting multiple sclerosis ("MS"), with "wax[ing] and wan[ing]" symptoms (AR 601, 818). In March, 2005, Plaintiff began to believe that her superiors were harassing her and that someone was trying to harm her, but it is unclear whether her fears were based on actual events or paranoia (AR 535). After experiencing "major disorientation," Plaintiff sought emergency psychiatric treatment from Marilou Inocalla, M.D. and Anderson Douglass, M.D. (AR 755-56). Plaintiff apparently took pride in her work and wanted to continue working (AR 514, 520, 536), but followed the recommendation of Dr. Inocalla that she avoid the stress of work (AR 513). Dr. Inocalla concluded "I cannot release [Plaintiff] to work at this time as her psychiatric symptoms of anxiety and panic are significant." (*Id.*).

So, Plaintiff began her second period of STD on August 8, 2005 (AR 554). On August 30, Defendant referred Plaintiff for a "standard battery" independent neuropsychological examination ("INE") (AR 515). Drs. Inocalla and Douglass wrote to Defendant jointly, opining that the scheduled test could worsen Plaintiff's "severe" psychiatric symptoms, which included a "fragile frame of mind," panic, labile mood, plunging self-esteem, paranoia, difficulty with recall, and decompensation (AR 519-20). They reported Plaintiff was willing to undergo the exam, but was worried about having "to go over painful issues again" (AR 518). The doctors were concerned the scheduled test might harm Plaintiff to such a degree that she would have to move from outpatient to inpatient treatment (AR 520). In September of 2005, a consulting psychologist reviewed Plaintiff's file and concluded that although Drs. Inocalla and Douglass believed Plaintiff could not perform her job, "it cannot be substantiated that the claimant would have been unable to perform the

3

core elements of her occupation, from a psychological perspective . . . ." (AR 531).

In October, 2005, Plaintiff participated in the requested INE, which was conducted by Dr. Lawhon (AR 532-40). According to Plaintiff, the INE was postponed to accommodate her fragile state of mind and was conducted over the course of three days rather than one [Doc. 30 at 4], but the Record contains only the cryptic comment of Dr. Lawhon that "[t]he evaluation took longer than expected." (AR 534). Dr. Lawhon observed that Plaintiff "became overwhelmed" and was "emotional and almost hysterical at times" (AR 534, 537). Dr. Lawhon noted Plaintiff was cooperative with the evaluation and her symptoms were "true and genuine," with no evidence of malingering (AR 532, 537). He concluded Plaintiff was clinically anxious and depressed and suffered from generalized anxiety disorder and post-traumatic stress disorder (AR 538). In addition, he noted the appearance of "some impairment in critical thinking and judgment" and a possibility of cognitive impairment related to the psychiatric disorder and the MS (AR 538, 540). He opined Plaintiff "d[id] not appear to be able to function as a sales representative . . . ." (AR 538).

In December, 2005, Plaintiff experienced weakness and numbness or paralysis in the left side of her body and was admitted to the hospital after seeking treatment in the emergency room (AR 545-47). Defendant was aware that after this episode, Plaintiff required help in bathing, dressing, cooking, cleaning, shopping, and climbing stairs (AR 812). A week after her discharge, Plaintiff was ambulatory, but needed support on one side (AR 608). Plaintiff's STD benefits were set to expire in February, 2006, so Defendant advised Plaintiff in December, 2005, to submit an application for LTD benefits. In conjunction with her application for LTD benefits, Plaintiff signed a reimbursement agreement agreeing to repay any overpayment of benefits (AR 563). Plaintiff was determined to be totally disabled and her claim for LTD benefits was approved in January, 2006,

4

with an effective date of February 6, 2006 (AR 588, 590). Under the Plan, a claimant is totally disabled when, for a period of twelve months after the expiration of STD benefits, she is unable to perform the essential functions of her regular occupation, and if the disability extends beyond that twelve-month period, unable to perform "any job" (AR 472-73). In the approval letter, Defendant noted Plaintiff's claim was being approved under the "regular occupation" definition of Total Disability, and that if her period of disability lasted longer than twelve months, her claim would be "reevaluated" under the "any job" definition of disability (AR 590).

Dr. Simnad commented in January, 2006, that Plaintiff's notable symptoms were fatigue, cognitive difficulties (particularly in multitasking), and mood lability (AR 609). Dr. Simnad was concerned Plaintiff's medications were exacerbating her mood instability (AR 610). Around that same time, Dr. Karen Johnston noted Plaintiff had "episodes of decreased visual focus" (AR 613). Dr. Johnston's primary concern, however, was cognitive function, and Dr. Johnston recommended neuropsychological testing if Plaintiff's condition did not improve.

In March, 2006, Dr. Kathleen Fuchs performed a neuropsychological examination of Plaintiff.[4] Dr. Fuchs observed Plaintiff used a cane to ambulate, and her gait was effortful, stiff, and slow (AR 622). Plaintiff's problem solving and executive functioning skills were within normal limits, but "below expectation relative to her baseline abilities." (AR 624). In addition, Plaintiff seemed "to be experiencing some unusual ideas that may include some magical thinking or

---

[4] The report of Dr. Fuchs' examination of Plaintiff is in the Record, but Defendant notes it was not made available until *after* Plaintiff's benefits were terminated and her first appeal was denied (AR 821). Dr. Fuchs' report was prepared in March of 2006, just before Broadspire was replaced by Reed Group as the third party administrator for the Plan (AR 620-28). Dr. Fuchs' report was not in Plaintiff's file with Broadspire (AR 821). However, Plaintiff provided Dr. Fuchs' name as one of her physicians in response to Reed Group's November 2006 request for attending physician statements and authorization for release of medical information (AR 637, 674).

5

delusional beliefs," and her thought processes were "marked by confusion, distractibility, and difficulty concentrating." (*Id.*). Dr. Fuchs opined that it was "likely [Plaintiff was] experiencing a disabling level of anxiety, symptoms of depression, and perhaps symptoms of mania," and was "very concerned" Plaintiff was suffering from bipolar disorder (AR 625). Dr. Fuchs further opined that, "consistent with her MS diagnosis, there ha[d] been compromise in her cognitive efficiency such that she would be unable to return to work." (*Id.*). Plaintiff "appear[ed] to be totally disabled from a cognitive and emotional standpoint" (*id.*). Dr. Fuchs concluded Plaintiff "appeared to demonstrate her best effort," and the test results were valid (AR 622). Although Dr. Fuchs noted Plaintiff's affect varied considerably during testing, she did not note that Plaintiff had any difficulty completing the test (AR 622).

Plaintiff was required under the Plan to apply for Social Security disability ("SSD") benefits (AR 496, 594), and with the assistance of Defendant (through its agent), she did so (AR 565-66, 596). In July, 2006, her SSD claim was denied (AR 634). The denial letter explained that, although she was unable to perform her past job, her physical limitations were not severe enough to prevent her from doing "less demanding" work (AR 636). On November 16, 2006, Drs. Inocalla and Douglass (psychiatrists) and Dr. John Ludgate, Ph.D. (psychologist) wrote jointly to the state agency responsible for disability determinations and explained that Plaintiff's "organic" psychiatric symptoms resulted from physical changes brought about by MS (AR 647). They observed the number of Plaintiff's brain lesions had tripled since her diagnosis in 2004, and she suffered from "significant decrease in cognitive ability" (AR 648). Based in part on that opinion, Plaintiff was determined to be eligible for SSD benefits on December 21, 2006 (AR 676-77). The Social Security Administration ("SSA") also explained that Plaintiff's inability to walk without assistance justified

6

their determination that she was unable to perform her past work or any other less demanding work. (AR 636, 677, 695). Defendant received notice of Plaintiff's SSD award in January, 2007 (AR 803).

In September, 2006, Plaintiff experienced a severe reaction to one of her medications and was hospitalized for three weeks (AR 652, 744, 760). After she was released, Plaintiff telephoned Defendant to report her hospitalization (AR 760, 800). Curiously, with the exception of Plaintiff's phone call to Defendant (AR 800) and a letter sent to Defendant during the appeals process (AR 760-61), Plaintiff's hospital stay is not directly documented in the Record.[5] Due to the failure of traditional "first line" treatments, Plaintiff began experimental intravenous immune globulin ("IVIG") therapy (AR 652, 761).

Plaintiff's eligibility for LTD benefits under the "regular occupation" definition of Total Disability was set to expire in February, 2007. In preparation for her reevaluation under the "any job" definition of Total Disability, Defendant wrote to Plaintiff in October, 2006, to request that she provide "attending physician statements" from her treating physicians (AR 637). On November 22, 2006, Defendant received the attending physician statement from Dr. Inocalla, who opined Plaintiff was totally disabled with respect to her previous job or any other job, and her condition was unlikely to change in the future (AR 645). Dr. Inocalla explained that Plaintiff's psychiatric symptoms were caused by her MS, and these "organic symptoms" would "most likely" not reverse (*id.*). Dr. Inocalla noted that Plaintiff's condition was "serious" and that she "should avoid stress [because of] cognitive impairment[] and physical limitations." (*Id.*). Also on November 22, 2006, Drs. Inocalla, Douglass, and Ludgate faxed a copy of their November 16, 2006, letter to the state agency, in which

---

[5] Plaintiff's account is corroborated, however, by other details in the Record (AR 652, 671, 673-75).

they set forth what Defendant called a "comprehensive abstract" explaining their conclusion (AR 800, 814). On November 29, 2006, Defendant received the attending physician statement from Dr. Hollandsworth, who similarly opined Plaintiff was totally disabled from any job and was not expected to improve (AR 675). Dr. Hollandsworth explained that Plaintiff had a "chronic noncurable condition" and "multiple failed therapies" (*id.*). Defendant incorporated these attending physician statements into Plaintiff's file (AR 799-800).

On November 8, 2006, before receiving the attending physician statements, Defendant informed Plaintiff she had been scheduled for another INE with Dr. Kristie Nies, whose areas of expertise include brain injury and malingering (AR 642, 681). The appointment was originally scheduled for November 29, 2006, but was rescheduled for January 10, 2007, because Plaintiff had a conflicting appointment with her neurologist on the earlier date (AR 800-02). Defendant asked Dr. Nies to determine whether Plaintiff was capable of performing any occupation, and if not, whether her condition could be expected to change (AR 643). When Plaintiff was informed of the 6-8 hour exam, she called Defendant, upset that she was being required to attend (AR 680, 800). Plaintiff told Defendant that she had "a progressive disease" and that an INE was unnecessary (AR 800). She also informed Defendant she was "unable" to attend an eight-hour test (AR 801). Defendant advised Plaintiff to submit a letter from her doctor to that effect (*id.*).

Dr. Hollandsworth prepared such a letter and faxed it to Defendant on December 7, 2006. In it, he stated Plaintiff had been diagnosed with MS, was under his care, and was experiencing "multiple disabling neurological symptoms which are unequivocally and solely a result of her [MS]." (AR 683). Dr. Hollandsworth opined that "[d]ue to the severity of her symptoms, she [was] medically unable to complete a standard neuropsychological testing battery." (*Id.*). Defendant

8

acknowledged receipt of this letter and incorporated it into the "case review for [Plaintiff's] any occ[upation] transition" (AR 801-02).

On January 5, 2007, Defendant telephoned Plaintiff and informed her that she was still expected to keep her appointment with Dr. Nies (AR 802). On the scheduled date, Plaintiff arrived at Dr. Nies' office (AR 688). She walked with a cane and with the assistance of her husband, and she needed help completing forms because her right hand was bandaged (*id.*). Plaintiff informed Dr. Nies she could not complete the test because of her "doctor's orders" (*id.*). According to Dr. Nies, Plaintiff was "adamant that she was not refusing the [INE]," but "equally adamant that she could not answer questions or participate in any way" (*id.*). Dr. Nies telephoned Defendant, concerned about potential legal liability if she attempted to persuade Plaintiff to participate despite her treating physician's orders (AR 802). Defendant instructed Dr. Nies to continue with the INE, who in turn encouraged Plaintiff to participate, but Plaintiff declined to do so (AR 689, 802).

Dr. Nies conducted a review of Plaintiff's records and concluded she had insufficient information to determine whether Plaintiff was capable of performing any occupation (*id.*). Plaintiff telephoned Defendant on April 20, 2007, stating she had been physically unable to complete the INE (AR 805). Defendant asked her if she was currently capable of performing an INE or would be amenable to completing an INE if it were to be rescheduled. According to a notation in the Record by Defendant, Plaintiff answered only that she was late for a doctor's appointment (*id.*). According to a letter in the Record written by Plaintiff, however, Plaintiff answered she would be amenable to taking the test if possible (AR 765). Defendant later acknowledged (without necessarily accepting) Plaintiff's version of events (AR 818).

On February 7, 2007, Defendant terminated Plaintiff's benefits retroactive to January 10,

2007, "due to non-compliance for failing to participate in the [INE]" (AR 803). Defendant informed Plaintiff of that decision by letter the next day (AR 698). Defendant notified Plaintiff of her right to appeal, and instructed her to "state the reason(s) you believe benefits were improperly denied and submit any written comments, documents, records, or other information relating to your claim that you believe appropriate." (AR 699).

Defendant also informed Plaintiff by letter that the benefits she received after January 10 were "overpayments" that she would be expected to repay (AR 700). Plaintiff responded she did not consider the overpayments to be a "bona fide obligation" until her appeals were exhausted, and she appealed the termination of her benefits (AR 704, 712). In addition, Plaintiff requested "any and all documents which relate to my claim for benefits," including, among other things, publications, books, pamphlets, and memoranda (AR 714). Defendant responded to the request, but did not produce either the Plan documents or records of Plaintiff's condition from Broadspire, the third party administrator for the Plan prior to April 1, 2006 (AR 628, 737-38). Concerned that Defendant did not have all her records, Plaintiff procured 97 pages of documents directly from Broadspire and mailed them to Defendant in late April, 2007 (AR 737-38).

On April 30, 2007, Defendant denied Plaintiff's first appeal because she "did not supply any medical information to support why she could not participate in the [INE]." (AR 806). Plaintiff was notified of this decision by letter dated May 8, 2007, in which Defendant explained "you did not supply any medical documentation with your appeal request to support why you were medically unable to complete the [INE]." (AR 726, 739). Plaintiff requested a second appeal on July 7, 2007, explaining that in the four months prior to the requested INE, she had spent 23 days in the hospital and had been in no condition to undergo the full-day examination (AR 743-44). Plaintiff described

to Defendant events which otherwise appear only scarcely, if at all, in the Record. These included her September, 2006, hospitalization, and her March 2006 neuropsychological examination with Dr. Fuchs (AR 758-61). With respect to the INE, Plaintiff informed Defendant that Dr. Douglas Wright, the neurologist who was supervising her IVIG treatments, also did not believe she was physically able to withstand a comprehensive INE, but that Dr. Wright felt a letter from Dr. Hollandsworth would be more appropriate given their longer treatment relationship (AR 671, 673-75, 763). Finally, Plaintiff summarized the evidence supporting her disability, noting that all the medical opinions and SSD determination were in agreement that she was totally disabled from any occupation (AR 743-50).

On August 23, 2007, Defendant denied Plaintiff's appeal "for lack of compliance with the Plan requirement to cooperate with respect to the evaluation of your disability." (AR 810, 822). Fourteen months later, Plaintiff filed this suit.

## III.    ANALYSIS

### A.    Parties' Competing Motions to Strike Portions of the Record

As a preliminary matter, Plaintiff moves to strike certain Plan documents from the Record on the ground that Plaintiff was not provided with those documents until after the commencement of litigation [Doc. 29]. The Record (as submitted by Defendant) includes certain Plan documents, as well as Summary Plan Descriptions ("SPDs" or "SPD" if singular) for years 2004 through 2008. Plaintiff argues that because she was provided only with the 2004 and 2005 SPDs, only those documents should be considered by the Court [Doc. 29, 33]. Defendant responds that the Plan documents must remain a part of the Record because the Pension Committee considered them when reviewing Plaintiff's claim [Doc. 32, 32-1]. Defendant further argues that the SPDs it allegedly

11

inadvertently included in the Record should be excluded because they were not considered when reviewing Plaintiff's claim.[6]

A court's review of a denial of benefits under ERISA is limited to the "facts known to the plan administrator at the time he made his decision." *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381 (6th Cir. 1996). This includes all the evidence actually considered by the administrator and the documents which describe the benefits plan itself, including SPDs. *See Brookings v. Hartford Life and Accident Ins. Co.*, 167 F. App'x 544, 547 n.4 (6th Cir. 2006); *Bass v. TRW Employee Welfare Benefits Trust*, 86 F. App'x 848, 851 (6th Cir. 2004).

I **FIND** each of the documents at issue was part of the facts known to the plan administrator at the time of the decision. I therefore **CONCLUDE** all the documents in the Record originally submitted by Defendant properly may be considered by the Court in reviewing Defendant's decision. Accordingly, I **RECOMMEND** that Plaintiff's motion to strike certain Plan documents [Doc. 29] and Defendant's motion to strike the SPDs be **DENIED**.

### B. Plaintiff's ERISA Claim

#### 1. Statute of Limitations

The Plan provides: "Any lawsuit filed by or on behalf of a Participant regarding the denial of a claim may be commenced only after a decision regarding the claim has been rendered on the second level of appeal and may not be commenced later than twelve months following the notice of the final determination on appeal." (AR 478). The 2004 and 2005 SPDs, in contrast, state only

---

[6] Defendant's argument was not submitted as a motion to strike the SPDs from the Record, but construing the pleadings liberally, it will be treated as such.

12

that "[s]econd level appeals determinations are final and binding."[7] (AR 96, 180). Defendant argues Plaintiff's claim is time-barred because it was brought fourteen months after the denial of Plaintiff's second appeal [Doc. 34 at 13]. Plaintiff responds that the twelve-month limitations period is inapplicable because of the SPDs' silence, and in the alternative, that the period should be equitably tolled.

### a.  Contractual limitations period

Plaintiff argues the twelve-month limitations period specified in the Plan is not applicable. ERISA does not contain its own statute of limitations, and where a plan does not specify a limitations period, courts apply the "most analogous state law statute of limitations." *Redmon v. Sud-Chemie Inc. Ret. Plan for Union Employees*, 547 F.3d 531 (6th Cir. 2008). In Tennessee, courts borrow the six-year statute of limitations for contract claims. *Massengill v. Shenandoah Life Ins. Co.*, 459 F. Supp. 2d 656, 659 (W.D. Tenn. 2006). Where, however, a plan specifies a different limitations period, the plan provision will be applied so long as it is reasonable. *Med Mut. of Ohio v. k. Amalia Enters.*, 548 F.3d 383, 390 (6th Cir. 2008). Plaintiff does not argue that a one-year limitations period is unreasonable, but instead argues the parties' relationship is governed by the 2004 and 2005 SPDs, which do not contain the twelve-month limitations period [Doc. 35 at 2].

As Plaintiff points out, if the terms of an SPD and a plan differ, the terms of the SPD will control because it is unfair "to publish and distribute a plan summary booklet designed to simplify and explain a voluminous and complex document and then proclaim that any inconsistencies will

---

[7]  Plaintiff did not receive any SPD documents after the 2005 SPD [Doc. 30 at 2, 34 at 14-15]. The 2006 SPD, which is also in the Record, was amended to include the limitations period (AR 266), but its insertion was not accompanied by a change in the table of contents (AR 248-49). In 2007, the SPD included both a paragraph stating the limitations period and a heading in the table of contents (AR 337).

13

be governed by the plan." *Edwards v. State Farm Mut. Auto. Ins. Co.*, 851 F.2d 134, 136 (6th Cir. 1988) (quoting *McKnight v. Southern Life and Health Ins. Co.,* 758 F.2d 1566, 1570 (11th Cir.1985)). However, a mere "inconsistency" between an SPD and a plan is insufficient to invoke this rule; instead, the SPD and plan must "directly conflict." *Valeck v. Watson Wyatt & Co.*, 92 F. App'x 270, 272 (6th Cir. 2004).

Here, the SPD does not specify a different limitations period than the Plan, but is merely silent as to the existence of a limitations period. The question, therefore, is whether an SPD's silence can create a direct conflict with a plan. This Court has previously held that an SPD's silence does not trump provisions contained in the plan. *Moon v. White*, 909 F. Supp. 1047, 1055 (E.D. Tenn. 1993) (Jordan, District Judge). Subsequent to *Moon*, however, the Sixth Circuit decided *Helwig v. Kelsey-Hayes Co.*, which held that an SPD's silence could create a direct conflict with an ERISA plan. 93 F.3d 243, 246, 249-50 (6th Cir. 1996); *see also Schornhorst v. Ford Motor Co.*, 606 F. Supp. 2d 658, 673 (E.D. Mich. 2009) ("where an SPD entirely omits a requirement or limitation that is set forth in the underlying plan document, the courts have routinely concluded that the SPD conflicts with the plan"). In *Helwig*, the plan contained conditions allowing the termination of benefits, but the SPD's description of benefits did not mention that they could be terminated. On those facts, the court held that the SPD governed the parties' relationship. 93 F.3d at 249-50.

It appears *Helwig*'s rule, however, must be limited to those instances where the SPD omits information it is required by law to contain. In *Helwig*, the court found it significant that ERISA requires an SPD to include information explaining "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits." 93 F.3d at 249 (quoting 29 U.S.C. § 1022(b)); *see also Haus v. Bechtel Jacobs, Co., LLC*, 491 F.3d 557, 565 (6th Cir. 2007) (explaining

14

that "[w]here an employer fails to satisfy the disclosure obligations [for SPDs], such that the information contained in a summary plan description is in conflict with that of the plan itself, it is logical that the courts enforce the terms of the summary plan."). In *Bolone v. TRW Sterling Plant Pension Plan*, by contrast, the court held there was no direct conflict between the SPD and the plan when the SPD was silent with respect to the plan administrator's discretion. 130 F. App'x 761, 765 (6th Cir. 2005). Although the court in *Bolone* did not distinguish *Helwig*, it is significant that SPDs are not required to disclose that the plan administrator has discretion to deny claims. *See Wald v. Southwestern Bell Corp. Customcare Medical Plan*, 83 F.3d 1002, 1006 (8th Cir. 1996). Similarly, the court held in *Sprague v. General Motors Corp.* that the principle that SPDs govern when there is a conflict with the plan "does not apply to silence." 133 F.3d 388, 401 (6th Cir. 1998). The court's rationale, however, rested on the observation that "a summary will not include every detail of the thing it summarizes." *Id.* If the SPD omits information that, by law, it *must* include, the reasoning in *Sprague* is inapposite. Indeed, the *Sprague* court noted that it was merely "declin[ing] to apply the judge-made rule of *Edwards* in such a way as to augment the detailed disclosure provisions of the statute," indicating the holding was limited to situations in which the statutory disclosure provisions do not apply. *Id.* at 402.

Complicating matters further, *Morrison v. Marsh & McLennan Cos., Inc.* held that when a limitations period was contained in the SPD, but not the plan, the documents had "no conflicting language." 439 F.3d 295, 301-02 (6th Cir. 2006). The court noted, however, that it was not deciding whether its holding would apply if the beneficiary had detrimentally relied on the plan's silence. *Id.* at 302, n.3. Thus, *Morrison*'s holding does not necessarily extend to the situation here, in which the SPD, rather than the Plan, is silent. In *Morrison*, there was no evidence that the

employee had relied on the plan's silence, *id.*, but an employee's reliance on an SPD is *presumed*. *See Helwig*, 93 F.3d at 247, 249 (noting that employees do not have to prove detrimental reliance in order to take advantage of the language in the SPD if they "could reasonably have relied" on the SPD); *Edwards*, 851 F.2d at 136 (plan administrator should have realized that the SPD "*could* or would have caused . . . employees to rely on [the] inadvertent misrepresentation") (emphasis added). Where the SPD is required by law to contain specific information, it is certainly reasonable for an employee to expect it to do so.

Finally, in *Clark v. NBD Bank*, the court examined a plan and SPD similar to the documents at issue in this case. 3 F. App'x 500, 504-05 (6th Cir. 2001). In *Clark*, as here, the plan contained a limitations period which was not mentioned in the SPD. *Id.* Despite the employee's lack of notice of the limitations period, the court held she was bound by it. *Id.* However, the court decided *Clark* on the narrow question of whether the limitations period should have been equitably tolled and did not address whether there was a conflict between the SPD and the plan. *Id.*

This Court must decide whether *Helwig*'s holding survives these later cases. Despite broad language in the later opinions, it appears that it must. Only *Helwig* dealt with the existence of a conflict between a plan and SPD in which the SPD omitted information it was required by law to contain. In addition, the rationales of *Sprague*, *Bolone*, and *Morrison* support the importance of that distinction. Moreover, none of the later opinions distinguish *Helwig*, and it cannot be assumed that one Sixth Circuit panel has overruled, *sub silentio*, the prior decision of another panel. *See United States v. Young*, No. 08-1394, 2009 WL 2836620, at *4 (6th Cir. 2009). Thus, the *Helwig* rule appears intact. Incidentally, this rule is consistent with the earlier holding of this Court in *Moon*, in which the SPD's silence did not create a conflict with the plan *because* the plaintiff did not

establish that the SPD omitted anything required by law.  909 F. Supp. at 1055.

Applying *Helwig*, the SPD's silence with respect to the existence of a limitations period for seeking judicial review *does* create a direct conflict with the Plan's twelve-month limitations period. An SPD is required by law to contain "[t]he procedures governing claims for benefits . . ., *applicable time limits*, and remedies available under the plan for the redress of claims which are denied in whole or in part." 29 C.F.R. § 2520.102-3(s) (emphasis added).  It must also include "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits."  29 U.S.C. § 1022(b).  I **CONCLUDE** the SPDs were required by law to contain the shortened limitations period. *See Manginaro v. Welfare Fund of Local 771*, 21 F. Supp. 2d 284, 293 (S.D.N.Y. 1998) (holding that 29 U.S.C. § 1022(b) required the SPD to include the shortened limitations period).

Here, Plaintiff's suit was filed fourteen months after notice of denial of the second appeal. [Doc. 1] & (AR 810-22).  The Plan requires any lawsuit to be brought within twelve months after such notice (AR 478), but there is no dispute that Plaintiff did not have a copy of the Plan until after the commencement of litigation [Doc. 30 at 2, 34 at 15].  The SPDs with which Plaintiff had been provided do not mention the twelve-month limitation period (AR 96, 180).  And, although the SPDs state that beneficiaries are entitled to copies of the Plan at their request (AR 73, 156), Plaintiff's request for "any and all documents which relate to my claim" was not answered with a copy of the Plan (AR 719).  Thus, because the SPDs in this case are silent with respect to the applicable time limit for seeking judicial review of a denied claim, and because it was reasonable for Plaintiff to rely on the SPDs' silence when deciding when to file her claim, I **CONCLUDE** the twelve-month limitations period in the Plan does not govern the parties' relationship.  *See Helwig* 93 F.3d at 247, 249.  Under the applicable state law statute of limitations, Plaintiff's claim is timely.  *See*

17

*Massengill*, 459 F. Supp. 2d at 659.

### b. Equitable tolling

Furthermore, even if the twelve-month limitations period was applicable, I **CONCLUDE** the period should be equitably tolled. In determining whether to toll an ERISA limitations period, courts consider five factors: (1) lack of actual notice, (2) lack of constructive notice, (3) diligence of the plaintiff in pursuing her rights, (4) absence of prejudice to the defendant, and (5) the reasonableness of the plaintiff's ignorance of the limitations period. *Clark v. NBD Bank*, 3 F. App'x 500, 504 (6th Cir. 2001) (citing *Andrews v. Orr*, 851 F.2d 146, 150 (6th Cir. 1988)). Defendant argues against tolling because Plaintiff had "access to the [P]lan and the pertinent information upon her request." [Doc. 34 at 15]. Plaintiff responds that, of the five *Clark* factors, only constructive notice is arguably in favor of Defendant's position [Doc. 35 at 3].

First, Plaintiff lacked actual notice. Again, there is no dispute that Plaintiff lacked a copy of the Plan before she filed her lawsuit [Doc. 30 at 2, 34 at 15]. Furthermore, the letter denying Plaintiff's second appeal (the event which triggered the limitations period) contained no mention of the limitations period, nor even any mention of Plaintiff's right to file suit as required by 29 C.F.R. § 2650.503-1(j)(4) (AR 810-22). Second, Plaintiff was diligent in pursuing her rights. She promptly submitted documents supporting her claim throughout the appeals process (e.g., AR 737-38) and asked for all the documents relating to her claim after her appeal was denied (AR 719). Third, Defendant does not suggest that a two month delay will cause it any prejudice, and the Court perceives none. Fourth, it was reasonable for Plaintiff to be ignorant of the limitations period; indeed, her ignorance may be laid squarely at the doorstep of Defendant, who failed to include this important information in the SPD.

18

Fifth, and finally, Defendant leans heavily on *Clark*, which held that where an employee had "access" to the plan containing the limitations period, equitable tolling was not warranted. 3 F. App'x at 504-05. Defendant argues Plaintiff had access to the Plan because the 2005 SPD states that a beneficiary under the Plan is entitled to "[o]btain, upon written request to the Plan Administrator, copies of documents governing the Plan." (A.R. 156). Defendant's reliance on Plaintiff's "access," however, is misplaced. To be sure, Plaintiff had a right to access the Plan documents, but when Plaintiff requested "any and all documents which relate to my claim for benefits," Defendant did not produce a copy of the Plan (AR 719). Moreover, *Clark* is distinguishable from the present case because, unlike the employee in *Clark*, Plaintiff was diligent in pursuing her rights. *Clark*, 3 F. App'x at 504 ("overriding factor" was that the employee was not diligent in pursuing her rights).

Therefore, even assuming *arguendo* that the twelve-month limitations period is applicable, I **RECOMMEND** it be equitably tolled.

### 2. Standard of review.

In order to articulate the appropriate standard of review, the Court must first identify the decision at issue and determine whether the plan gave the administrator discretion in making that decision. Here, both the initial termination of Plaintiff's benefits and the denial of her second appeal were based exclusively on Plaintiff's failure to complete the scheduled INE with Dr. Nies, which Defendant characterized as "fail[ure] or refus[al] to cooperate with respect to the evaluation of [Plaintiff's] disability" and "refus[al] to submit to a medical examination" (AR 698, 822). In addition, in the denial of Plaintiff's first appeal, Defendant asserted the termination of benefits was justified because Plaintiff failed "to provide proof of continuing disability as requested," (AR 699) and because the "medical documentation . . . d[id] not substantiate [Plaintiff's] disability . . . ." (AR

19

739).

The Plan provides in pertinent part that the Pension Committee "may exercise discretion in making determinations of fact, interpreting the terms of the Plan, adopting rules and taking other actions with respect to which it has authority." (AR 489). The Plan also gives the Pension Committee the authority to delegate its discretion to a third party (AR 490). Each of the decisions at issue in this case is covered by this discretionary grant of power. For example, whether Plaintiff "refuse[d] to cooperate" with the requested evaluation of her disability requires an interpretation of that term. Similarly, whether the documentation in the administrative record "substantiate[s]" Plaintiff's disability is a determination of fact subject to the administrator's discretion.

Where the administrator of an ERISA benefits plan has discretionary authority to determine eligibility for benefits or to construe the terms of the plan, the administrator's decisions must be affirmed unless they are "arbitrary and capricious." *Calvert v. Firstar Finance Inc.*, 409 F.3d 286, 291-92 (6th Cir. 2005). If it is possible to offer a "reasoned explanation" for the decision, based solely on the evidence known to the administrator, then the decision is not arbitrary and capricious. *Hunter v. Caliber System, Inc.*, 220 F.3d 702 (6th Cir. 2000); *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381 (6th Cir. 1996). This standard is not demanding, but neither is it toothless. *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 169, 172 (6th Cir. 2003). Courts must scrutinize the decision to determine whether, "substantively or procedurally, [the plan administrator] has abused his discretion." *Metropolitan Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 2350 (2008). In other words, the administrator's decision will be upheld only "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Glenn v. MetLife*, 461 F.3d 660 (6th Cir. 2006) (*aff'd*, 128 S. Ct. 2243). To be "substantial," evidence must be adequate,

in light of the entire record, to reasonably support the conclusion. *See Metropolitan Life Ins. Co. v. Conger*, 474 F.3d 258, 265 (6th Cir. 2007) (noting that selective review of the record is an abuse of discretion). And, to engage in a "deliberative, principled reasoning process," the administrator must do more than state a conclusion; it must logically apply the relevant evidence to the appropriate contractual standard. *See Shelby County Health Care Corp. v. Majestic Star Casino*, Nos. 08-6078/6419, slip op. at 21 (6th Cir. Sep. 22, 2009) (failure to adequately explain decision will support a remand to the plan administrator); *Bennett v. Kemper Nat. Servs., Inc.*, 514 F.3d 547, 556 (6th Cir. 2008) ("explanation of the decision-making process" was inadequate where administrator simply stated a conclusion); *Elliot v. Metropolitan Life Ins. Co.*, 473 F.3d 613, 618-19 (6th Cir. 2006) (where administrator did not logically explain why medical data supported conclusion about claimant's work ability, decision was arbitrary and capricious).

### 3. Application of the arbitrary and capricious standard.

The court's evaluation of the plan administrator's decision under the arbitrary and capricious standard of review is informed by several factors, including the existence of a conflict of interest and the administrator's consideration of an award of Social Security benefits. *DeLisle v. Sun Life Assurance Co. of Canada*, 558 F.3d 440, 444-45 (6th Cir. 2009).

### a. Conflict of interest

Plaintiff argues Defendant was operating under a conflict of interest in terminating her benefits [Doc. 35 at 6]. In the ERISA context, two sorts of conflict are possible: (1) a structural or "inherent" conflict and (2) a specific, individual "bias." *See Klein v. Central States*, No. 09-3275, 2009 WL 2877933, at *3 (6th Cir. Sep. 10, 2009) (unpublished). A structural conflict of interest exists when the plan administrator both evaluates and pays benefits claims. *Glenn*, 128 S. Ct. at

2348. On the other hand, when decisionmakers receive no "personal financial benefit" from approving or denying claims, there is no structural conflict. *Klein*, 2009 WL 2877933, at *3. A "bias" conflict of interest is case specific, and requires the plaintiff to show the decision was motivated by cost saving considerations. *Id.* In making this showing, it is not enough that the decisionmaker was aware of the costs involved or considered the legal ramifications of the decision. *Id.* If there is a conflict of either sort, courts take its severity into account when determining whether an administrator has abused its discretion, affording it more weight where other circumstances indicate it may have affected the ultimate decision. *DeLisle*, 558 F.3d at 445.

Defendant notes initially that the trust from which LTD benefits are paid is funded solely by employee contributions and eligibility decisions are made separately by the Pension Committee [Doc. 34 at 16]. Plaintiff responds that a conflict of interest exists nonetheless, pointing out that as long as Plaintiff remained on LTD leave, she also remained entitled to health and life insurance, which are funded by contributions from both Johnson & Johnson and employees (AR 70-72, 497). The termination of Plaintiff's LTD benefits therefore stood to save Johnson & Johnson a substantial amount of money. Contrary to Plaintiff's argument, Johnson & Johnson may have had a financial interest in the decision, but it was not the entity making the decision. Instead, the Pension Committee was responsible for determining benefits eligibility (AR 489).

It appears that Defendant went to great lengths to avoid a conflict of interest. Benefits were paid from the trust, and the trust was funded solely by employee contributions (AR 72, 492). Furthermore, "[n]either the Company nor the Pension Committee [was] liable to provide any benefits under the Plan . . . ." (AR 492). Accordingly, I **FIND** no structural conflict of interest existed.

Plaintiff argues further that the Pension Committee was predisposed to deny her claim because "[i]n this case, [the Claims Service Organization's] own calculations reveal that [Plaintiff's] LTD claim stood to cost [Defendant Johnson & Johnson] nearly $1 million . . . ." [Doc. 30 at 14]. Plaintiff submits no other evidence of bias against her claim, and Defendant's awareness of the dollar amount of a claim is insufficient to establish a conflict of interest. *See Klein*, 2009 WL 2877933, at *3. I **FIND** Plaintiff has not shown any bias against her claim.

### b.     Award of Social Security Disability benefits

As noted above, another factor in evaluating whether the decision was arbitrary and capricious is whether the plan administrator took inconsistent positions with respect to the claimant's eligibility for Social Security disability ("SSD") benefits. *Bennett v. Kemper Nat'l Servs.*, 514 F.3d 547, 554 (6th Cir. 2008). If the plan administrator (1) encourages the applicant to apply for SSD, (2) financially benefits when the applicant is determined to be disabled and receives an award of benefits, and (3) then fails to explain why it takes a different position on the question of disability, the inconsistency will weigh in favor of finding that the decision was arbitrary and capricious. *Id.*

Plaintiff argues this factor weighs in her favor because Plaintiff was required under the Plan to apply for SSD benefits and her LTD benefits were offset by her SSD award (AR 496, 695). Defendant responds the factor is irrelevant because Defendant did not ever determine whether Plaintiff was disabled, but rather terminated her benefits because she did not participate in the INE [Doc. 34 at 17-18]. With respect to the decision to terminate Plaintiff's LTD benefits because of her "refus[al] to cooperate," Defendant's contention is correct. I **FIND** there is no inconsistency between the conclusions that Plaintiff was disabled for purposes of SSD benefits but was not eligible

for LTD benefits because of her non-participation in the examination.

However, three months after Plaintiff received SSD benefits, Defendant asserted that the medical documentation of Plaintiff's illness "d[id] not substantiate [her] disability . . . ." (AR 695, 739). Thus, I **FIND** Defendant's failure to explain the inconsistency between the SSD determination and the finding that Plaintiff had insufficient documentation of her disability is a factor to be weighed in ascertaining whether that decision was arbitrary and capricious.

### 4. The decision to terminate benefits and subsequent appeals denials.

According to Defendant, Plaintiff failed or refused to attend a scheduled INE, failed or refused to cooperate with respect to the evaluation of her disability, and failed to provide proof of continuing disability when she did not complete the INE on January 10, 2007 (AR 698-99, 739, 822). Each of these is an independent ground for termination of benefits under the Plan (AR 481-82).

### a. Attendance at the INE

Insofar as Defendant's decision rested on Plaintiff's failure to attend the INE, that decision is inconsistent with Defendant's own characterization of Plaintiff's actions. Defendant's correspondence to Plaintiff explaining the denial of her first appeal acknowledged Plaintiff's attendance: "On 01/10/2007, you attended an Independent Medical Examination with Dr. Kristie J. Nies." (AR 726). Paradoxically, however, the first appeal was denied for Plaintiff's "fail[ure] or refus[al] to attend an examination" (AR 739). It is clear that the termination of benefits was not premised on Plaintiff's failure to *attend* the INE, but was instead premised on her failure to *participate in and complete* the INE.

24

### b.      Cooperation with the evaluation

### i.      Procedural abuse of discretion

The Plan excludes a participant from eligibility for LTD benefits if she "fails or refuses to cooperate with respect to the evaluation of [her] . . . continuing Total Disability." (AR 481-82). Plaintiff argues the termination of her benefits based on her failure to complete the scheduled INE is arbitrary and capricious, characterizing it as a decision that she was "too disabled to prove her disability." [Doc. 30 at 14]. Defendant responds that "[t]here is no dispute . . . that Plaintiff refused to go through with the January 10, 2007, INE." [Doc. 34 at 19]. Aside from this conclusory statement, however, Defendant does not explain why Plaintiff's failure to complete the INE was a failure to cooperate. When Defendant terminated Plaintiff's benefits, the "explanation" merely recited the Plan language (viz., the exclusion for "refus[al] to cooperate") and quoted Dr. Nies' observations (viz., that Plaintiff had a letter from her physician stating she was "medically unable" to participate and that she stated she "was not refusing" but "could not" participate because of her "doctor's orders") (AR 698). Defendant failed to explain why Plaintiff's conduct justified the conclusion that she refused to cooperate. Thus, when Plaintiff's benefits were terminated, Defendant did not engage in the deliberative, principled reasoning process required of plan administrators. *See Bennett*, 514 F.3d at 556 (mere conclusion was insufficient to show reasoned decision); *Elliot*, 473 F.3d at 618.

In addition, Defendant's failure to adequately explain its decision runs afoul of 29 C.F.R. § 2560.503-1(g), which requires Defendant to "set forth, in a manner calculated to be understood by the claimant . . . [t]he *specific* reason or reasons for the adverse determination" and to describe "any additional material or information necessary . . . to perfect the claim and an *explanation* of why such

material or information is necessary" (emphasis added). In the termination letter, Defendant should have explained not only why it considered Plaintiff's conduct to be a refusal to cooperate, but also why her physician's letter was inadequate to excuse her from the INE, and what additional information was necessary to perfect her claim. I therefore **CONCLUDE** Defendant's failure to explain its decision was procedurally arbitrary and capricious.

### ii.    Substantive abuse of discretion

Defendant was aware that Plaintiff arrived at her appointment but had a doctor's order not to participate (AR 698). If Plaintiff was indeed unable to undergo the INE, then her failure to do so cannot be said to be a failure or refusal to cooperate. To be sure, Defendant has the discretion to interpret the terms of the Plan (AR 489), but the term "cooperate" can only stretch so far. It cannot reasonably be interpreted to require a claimant to complete a test that she is medically unable to complete. To permit such an interpretation would give plan administrators the unfettered power to design impossible tests and deny claims with no effective review. The soundness of Defendant's decision, therefore, turns on whether the Record can support a conclusion that Plaintiff was able, but unwilling, to participate in the INE. *See Lukpetris v. Hartford Life and Acc. Ins. Co.*, 2007 WL 1565759, at *6-7 (W.D. Mich. May 29, 2007) (employee's repeated failure to respond to employer's requests that he participate in a rehabilitation program was substantial evidence he refused to cooperate). If Plaintiff's objections were reasonable, she cannot be denied benefits for being uncooperative. *See Acierno v. First Unum Life Ins. Co.*, 2002 WL 1208616, at *3 (E.D.N.Y. Mar. 31, 2002) (stating that failure to submit to an independent medical examination will bar the employee from receiving ERISA benefits unless the employee stated a "*reasonable* and timely objection to the scheduled location, date, or time, or to particular risks which the examination might

pose" ) (emphasis added).

The Record is clear that Plaintiff appeared at the scheduled time and place but believed herself unable to participate in the scheduled INE (AR 683, 688). Her physician opined she was "medically unable" to participate in a standard INE (AR 683). In addition, she was "adamant that she was not refusing" the examination but "could not" participate (AR 688). Furthermore, Plaintiff walked with a cane and with the assistance of her husband on the day of the examination (*id.*). In addition, her hand was bandaged and she needed her husband's assistance to fill out forms, which is significant in light of the fact that the scheduled 6-8 hour INE was to include "paper and pencil tasks" and computer tests (AR 488, 680, 688). The Record also shows that, during a previous INE, Plaintiff exhibited "emotional decontrol," causing the evaluation to "t[ake] longer than expected" (AR 537). These symptoms were reported to be "true and genuine," with no malingering (*id.*). The only reasonable interpretation of the evidence available to Defendant is that Plaintiff needed *at least* to reschedule the examination. No such opportunity was provided, nor did Defendant even suggest it might be a possibility, until well after Plaintiff's benefits were terminated (AR 805).

Defendant has shown nothing in the Record supporting its conclusion that Plaintiff refused to cooperate. Defendant argues Plaintiff could not have been unable to participate because she had completed a similar examination with Dr. Fuchs in March of 2006 [Doc. 34 at 19]. This argument is unpersuasive. First, Defendant maintains it did not know of Dr. Fuchs' examination when it terminated Plaintiff's benefits (AR 821-22). Second, the argument misses the point. There is nothing in the Record to suggest Plaintiff would not have been able to participate in an INE on a different date or with accommodations had she been allowed to do so. As Plaintiff notes, the very nature of relapsing/remitting MS consists of "wax[ing] and wan[ing]" symptoms (AR 818).

27

Furthermore, in the intervening period between Dr. Fuch's evaluation and the scheduled INE, the Record shows Plaintiff's condition took a turn for the worse and she was hospitalized for three weeks (AR 800).

Defendant also argues that Dr. Hollandsworth's opinion that Plaintiff was unable to complete a "standard neuropsychological testing battery" was properly rejected because it was not detailed enough--specifically, because Dr. Hollandsworth did not define what a "standard" battery would include [Doc. 34 at 20]. Yet, the Record shows Defendant's former third party administrator, Broadspire, had specifically requested that Plaintiff undergo a "standard battery neuropsych eval, with standard questions" (AR 515). Under these circumstances, rejection of Dr. Hollandsworth's opinion for utilizing the same language employed by Broadspire would be arbitrary and capricious.

In addition, Defendant argues that Dr. Hollandsworth's letter should have included "medical documentation" (AR 739) or "objective evidence" of his conclusion that Plaintiff was unable to participate in the exam [Doc. 34 at 20]. Again, Defendant's argument misses the point. First, Defendant points to no medical evidence contradicting Dr. Hollandsworth's assessment of Plaintiff's condition or Plaintiff's credibility. Defendant must have some substantial evidence that Plaintiff was uncooperative in order to justify terminating her benefits on that basis. Even Defendant's own independent examiner had previously opined that Plaintiff was cooperative in her first INE and her symptoms were "true and genuine," with no evidence of malingering (AR 532, 537). Second, Defendant did not inform Plaintiff that her physician's opinion needed more "medical documentation" of her inability to participate in the INE until three months *after* the termination of

28

her benefits (AR 739).[8]

Finally, Defendant argues Plaintiff should have submitted information from multiple physicians or that her physician should have suggested some appropriate accommodations for her condition [Doc. 34 at 20]. Yet, when Plaintiff complained she was not able to take the test, Defendant simply instructed her to submit a letter to that effect from her physician, and Plaintiff did so (AR 683, 801). If Defendant required multiple letters from various physicians or specific recommendations for accommodations, Defendant should have notified Plaintiff and given her the opportunity to provide them. Therefore, I **CONCLUDE** Defendant's termination of Plaintiff's benefits was substantively arbitrary and capricious because there is no substantial evidence in the Record that Plaintiff was able to participate in the INE but refused to do so.

Accordingly, I **RECOMMEND** that Plaintiff's motion for judgment, to the extent it seeks to invalidate Defendant's termination of her LTD benefits as arbitrary and capricious, be **GRANTED**.

### c. Failure to provide proof

Plaintiff asserts the Record shows she is totally disabled from performing any occupation and on that basis seeks a retroactive award of benefits [Doc. 35 at 11-13]. Because the plan administrator is vested with the discretion to determine whether a claimant is totally disabled, a court's review is limited to determining whether the administrator's decision was arbitrary and capricious. *See Calvert*, 409 F.3d at 291-92. Defendant contends it has made "no decision . . . as to Plaintiff's eligibility for benefits" and its decision rested solely on Plaintiff's failure to complete

---

[8] As noted above, this three-month failure to describe "any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary" was a violation of 29 C.F.R. § 2560.503-1(g).

29

the INE [Doc. 34 at 17-18]. I **CONCLUDE** it would be improper for the Court to grant the requested relief if Defendant has made no decision for the Court to review.

In denying Plaintiff's first appeal, Defendant determined that Plaintiff failed "to provide proof of continuing disability as requested" (AR 699). This is apparently a reference to Plaintiff's obligation under the Plan "to provide . . . information necessary to evaluate [her] medical condition and functional capacity" (AR 480). In addition, Defendant concluded Plaintiff's "medical documentation . . . d[id] not substantiate [her] disability . . . ." (AR 739). I **FIND** Defendant has not determined whether Plaintiff is indeed totally disabled from performing any occupation. In context, Defendant's statement that the "documentation d[id] not substantiate [Plaintiff's] disability" is not a finding that Plaintiff was *not* disabled, but merely a finding that, without the requested INE, there was insufficient information in the Record to make that decision. Furthermore, for the reasons below, I **CONCLUDE** it was not arbitrary and capricious for Defendant to determine there was insufficient information to support a finding of total disability.

As discussed above, the Court must consider Defendant's inconsistent positions with respect to an award of SSD benefits. Defendant not only encouraged Plaintiff to apply for SSD, but required her to do so and assisted her in that process (AR 565-66, 596). Defendant also benefitted financially from Plaintiff's award, as her LTD benefits were offset by the amount of SSD benefits (AR 496). Eligibility for SSD benefits requires a determination that a claimant is unable to perform any gainful work, and it is somewhat inconsistent for Defendant to conclude Plaintiff had not shown she was unable to work in any occupation. See *Bennett*, 514 F.3d at 554. However, although the inconsistency must be considered, it carries little weight on these facts. An ERISA plan's requirements may be more stringent than the SSA's, and evidence sufficient to support an award by

30

the latter may not qualify a claimant under the requirements of the former. *See DeLisle*, 558 F.3d at 445-46.

Furthermore, the propriety of Defendant's decision must be evaluated by considering the Record as it existed when the decision was made. *See Moon v. Unum Provident Corp.*, 405 F.3d 373, 378 (6th Cir. 2005). When Defendant denied Plaintiff's first appeal, the Record did not contain the evaluation by Dr. Fuchs (AR 821). The Plan placed the burden of providing proof of disability on Plaintiff (AR 480), and according to Defendant, without Dr. Fuchs' report, the Record contained "no measurable objective testing validating [Plaintiff's] complaints of cognitive deficits." (AR 822). Defendant is entitled to request objective evidence of a claimant's subjective complaints and medical opinions based on those subjective complaints. *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 166 (6th Cir. 2007) ("Requiring a claimant to provide objective medical evidence of disability is not irrational or unreasonable."). Moreover, Defendant's position is supported by substantial evidence: Dr. Nies concluded from her review of the Record (without Dr. Fuchs' report) that there was insufficient evidence to determine whether Plaintiff was able to perform any occupation (AR 688).

In summary, Defendant's determination that the Record is insufficient to determine Plaintiff's continuing eligibility for benefits was not arbitrary and capricious, but the determination that Plaintiff's failure to complete the scheduled INE constituted a failure or refusal to attend or cooperate was arbitrary and capricious. For these reasons, I **RECOMMEND** that Plaintiff's request for a retroactive award of benefits be **DENIED**, but that Plaintiff's cause be **REMANDED** to Defendant for further consideration of whether she is totally disabled under the "any occupation" definition. *See Shelby County Health Care Corp. v. Majestic Star Casino*, Nos. 08-6078/6419, slip op. at 21 (6th Cir. Sep. 22, 2009) (citing *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1288

(10th Cir. 2002)) (where administrator fails to adequately explain the grounds of its decision, remand is the appropriate remedy); *Proffitt v. Group Long Term Disability Plan for Family Practice Center*, No. 2:06-cv-97, 2007 WL 2692177, at *11 (E.D. Tenn. Sep. 12, 2007) (where it was unclear whether claimant was entitled to benefits under the "any occupation" provision, remand was appropriate remedy). In light of this recommendation, the Court need not reach Plaintiff's request for prejudgment interest at this time.

### C. Attorney's Fees

Plaintiff also seeks attorney's fees under 29 U.S.C. § 1132(g), but has submitted no information regarding the amount of her attorney's fees. The Court has discretion to allow reasonable attorney's fees and is guided by a five-factor test: (1) the degree of the opposing party's culpability or bad faith; (2) the opposing party's ability to satisfy an award of attorney's fees; (3) the deterrent effect of an award on other persons under similar circumstances; (4) whether the party seeking fees sought to confer a common benefit on other participants or to resolve a significant legal question regarding ERISA; and (5) the relative merits of the parties' positions. *Moon v. Unum Provident Corp.*, 461 F.3d 639, 642 (6th Cir. 2006). Fees may be awarded to a plaintiff who, even though she has not "experienced ultimate success in the sense of winning [her] benefits claim against Defendant, . . . has received another shot at those benefits by achieving a remand." *McKay v. Reliance Standard Life Ins. Co.*, No. 1:06-cv-267, 2009 WL 537197, at *5 (E.D. Tenn. Mar. 3, 2009). However, at this juncture, I **RECOMMEND** that Plaintiff's motion for fees be **DENIED** as premature. *See also* Fed. R. Civ. P. 54(d)(2).

### D. Defendant's Counterclaim

Defendant seeks repayment of $3,314.78 in alleged overpayments of LTD benefits [Doc. 21

at 27-31]. Because Defendant's termination of Plaintiff's benefits was arbitrary and capricious, I

**CONCLUDE** that Defendant has not shown it is entitled to the relief sought, and I **RECOMMEND**

Defendant's motion for judgment on the pleadings on the counterclaim be **DENIED**.

## IV.    CONCLUSION

Having carefully reviewed the Record and the pleadings, I **RECOMMEND** that:[9]

(1)    Plaintiff's motion to strike portions of the Record [Doc. 29] be **DENIED**;

(2)    Defendant's motion to strike portions of the Record be **DENIED**;

(3)    Plaintiff's motion for judgment on the Record [Doc. 30] be **GRANTED IN PART** and **DENIED IN PART**, to wit:

    (a)    Plaintiff's motion relating to the termination of her LTD benefits be **GRANTED**;

    (b)    Plaintiff's motion relating to the retroactive award of LTD benefits, prejudgment interest, and attorney fees be **DENIED**;

    (c)    Defendant's decision terminating Plaintiff's LTD benefits be **REVERSED** and this cause be **REMANDED** to Defendant for further consideration; and

(4)    Defendant's motion for judgment on the pleadings for recovery of alleged overpayments be **DENIED**.

                              *s/Susan K. Lee*
                              SUSAN K. LEE
                              UNITED STATES MAGISTRATE JUDGE

---

[9] Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).